UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------ x
BRIAN R. CALLAHAN,

                      Petitioner,

       - against -                       13 CR 453 (ADS)

UNITED STATES OF AMERICA,

                      Respondent.
------------------------------------------------------ x
UNITED STATES OF AMERICA,

       - against -                       13 CR 453 (ADS)

BRIAN R. CALLAHAN and
ADAM J. MANSON,

                      Defendant.
------------------------------------------------------ x

MEMORANDUM OF LAW IN SUPPORT OF ORDERS (1) DISQUALIFYING THIS UNITED STATES ATTORNEY'S OFFICE; (2) FOR RECUSAL AND REASSIGNMENT OF THESE CASES TO ANOTHER JUDGE; (3)  REQUIRING THE GOVERNMENT TO HEW TO ITS INDICTMENT AND HONOR ITS PLEA AGREEMENT WITH MR. MANSON; (4) FOR MR. CALLAHAN'S IMMEDIATE RELEASE ON BOND; AND (5) PERMITTING MR. CALLAHAN TO SUPPLEMENT HIS PENDING PETITION PURSUANT TO 28 U.S.C. §2255

                                              Andrew J. Frisch
                                              The Law Offices of Andrew J. Frisch
                                              One Penn Plaza, Suite 5315
                                              New York, New York 10119
                                              (212) 285-8000
                                              afrisch@andrewfrisch.com

                                              *Attorney for Brian Callahan and Adam Manson*

## TABLE OF CONTENTS

| | | |
|---|---|---|
| Introduction | | 2 |
| A. | Background | 4 |
| B. | This United States Attorney's Office is Conflicted | 9 |
| C. | Second Circuit Law Favors Reassignment of this Case to Another Judge | 11 |
| D. | The Government Has Breached Its Plea Agreement with Mr. Manson for the Same Reasons that Mr. Callahan's Waiver of Post-Conviction Remedies is Invalid | 12 |
| | *1. The Government Should Be Ordered to Honor its Agreement with Mr. Manson* | 12 |
| | *2. For the same reasons, Mr. Callahan's Waiver is Invalid* | 14 |
| E. | The Court Should Grant Bond to Mr. Callahan Pending Resolution of His Petition | 16 |
| | *1. Under the Correct Guideline Range, Mr. Callahan is Now Eligible for Release* | 16 |
| | *2. The Second Circuit Permits Bond on a Pending Petition Pursuant to Section 2255* | 17 |
| F. | The Court Should Permit Mr. Callahan to Amend His Petition | 17 |
| Conclusion | | 19 |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------ x

BRIAN R. CALLAHAN,

        Petitioner,

   - against -                         13 CR 453 (ADS)

UNITED STATES OF AMERICA,

        Respondent.
------------------------------------------------------ x

UNITED STATES OF AMERICA,

   - against -                         13 CR 453 (ADS)

ADAM MANSON,

        Defendant.
------------------------------------------------------ x

MEMORANDUM OF LAW IN SUPPORT OF ORDERS (1) DISQUALIFYING
THIS UNITED STATES ATTORNEY'S OFFICE; (2) FOR RECUSAL AND
REASSIGNMENT OF THESE CASES TO ANOTHER JUDGE; (3)  REQUIRING
THE GOVERNMENT TO HEW TO ITS INDICTMENT AND HONOR ITS PLEA
AGREEMENT WITH MR. MANSON; (4) FOR MR. CALLAHAN'S IMMEDIATE
RELEASE ON BOND; AND (5) PERMITTING MR. CALLAHAN TO SUPPLEMENT
<u>HIS PENDING PETITION PURSUANT TO 28 U.S.C. §2255</u>

Introduction

> *Good authors too, who once knew better words,*
> *Now only use four-letter words*
> *Writing prose.*
> *Anything goes.*
>                             - Cole Porter, 1934

       Cole Porter's dismay about devolving norms should not be an acceptable standard

for prosecutorial action.  We afford the government great discretion to act and take positions in

3

criminal prosecutions, and so the government's candor is necessarily indispensable. Even where the government believes it appropriate to push the envelope, we reasonably expect it to guard fastidiously against any advocacy that serves, even negligently as opposed to recklessly or deliberately, to mislead or create a false impression. Prosecutorial legerdemain is unacceptable even in service of an objective perceived by any particular case agent, or even a prosecutor, as righteous. Customary deference to the government must yield where its conduct of a particular case crosses the line.

On February 6, 2019, after Brian Callahan filed his pending Petition pursuant to 28 U.S.C. §2255 (the "Petition," hereby incorporated by reference as if fully set forth herein), but before the sentencing of co-defendant Adam Manson, the Chief of the United States Attorney's Criminal Division responded to defense counsel's expressed concerns about this case by asking the assigned prosecutor to disclose a fifteen-page spreadsheet of 32 columns and 1,917 rows and an associated summary (both available for the Court's inspection) as the basis for the government's view that its view of fraud loss under the United States Sentencing Guidelines comports with the indictment's express allegations and the government-drafted plea agreements. Upon disclosure of the spreadsheet, defense counsel promptly provided it (together with other relevant case documents) to Mazars USA ("Mazars"), a highly-respected accounting firm. Mazars has now concluded an analysis of the government's spreadsheet (Exhibit A hereto with accompanying Declaration), which helps show that the government unfairly changed this case on the virtual eve of Mr. Callahan's sentencing to create a grossly unfair estimate of loss, thereby violating basic norms of due process and fundamental fairness and the government's plea agreements with Mr. Callahan and Mr. Manson.

4

Disqualification of an entire United States Attorney's office is drastic and unusual, but so too are the circumstances of this case, which appear unprecedented. As this Memorandum and the attached exhibits demonstrate, the only adequate remedy for the conduct of this case by this United States Attorney's Office is its disqualification so the Department of Justice can appoint another. More, as explained herein, and for the reasons stated in *United States v. Wilson*, 920 F.3d 155, 168 (2d Cir. 2019), we respectfully request the Court recuse itself in favor of another Judge.

A.   Background

From the beginning of this case in 2013, the government in its indictment and other public statements of the case represented to the Court and the defendants that this case charged a $96 million *Ponzi* scheme [*See* Indictment at ¶22], expressly alleging that certain investments made by Mr. Callahan into independently-managed hedge funds were not criminal nor induced by fraud and were properly made. *See* Indictment at ¶¶4-6, 22. The defendants both pled guilty, relying on the indictment itself and the government's repeated representations in correspondence with the Court [Exhibit B], press statements to the public [Exhibit C], and the government-drafted plea agreements [Exhibits D and E] that the charged crime was a $96 million Ponzi scheme that expressly excluded certain investments.

The government's view of this case did not change until September 13, 2017, two days before Mr. Callahan's sentencing, when it submitted a letter to the Court in aid of sentencing [Document 158, attached as Exhibit F], addressing the credits against loss to which the defendants were entitled under the Sentencing Guidelines. *See* U.S.S.G. §2B1.1 (2013) *Commentary*, Application Note 3(E)(i) and (ii); *United States v. Leonard*, 529 F.3d 83 (2d Cir.

5

2008).  The government in its letter identified total credits of $120,839,000, including $74 million of redemptions to Mr. Callahan's investors, $40.3 million from the sale of the Panoramic View resort, and $6.4 million recovered from the independently-managed hedge funds when Mr. Callahan's assets were seized.

Mr. Callahan was not, however, entitled to all of the credits of $120,839,000 against loss.  As Mazars explains in its accompanying analysis and Declaration [Exhibit A], Mr. Callahan was entitled to $95,541,738 of the total credits of $120,839,000 identified by the government in its letter.  *See* Exhibit F.  The credits to which Mr. Callahan was not entitled included three categories of credits as Mazars explains in its accompanying Declaration:

> *First*, Mr. Callahan was not entitled to a credit for the $6.4 million recovered from the independently-managed hedge funds.  The indictment expressly alleged that the investments made by Mr. Callahan into the independently-managed hedge funds were not criminal nor induced by fraud and were properly made, so they did not represent a credit against loss;
>
> *Second*, the government did not appear to include as loss the entirety of certain investments made in one of Mr. Callahan's investment vehicles, Pangea Offshore High Yield Portfolio, LLC ("Pangea"), and so Mr. Callahan was not entitled to treat all Pangea-related redemptions as credits; and
>
> *Third*, Mr. Callahan was not entitled to so much of the net proceeds from the sale of the Panoramic View that served to repay Pangea-related investments.

Exhibit A.

The government at Mr. Callahan's sentencing, however, made no effort to allocate the credits as required.  Instead, upon determining that the total value of credits was $120,839,000, the government changed the case to increase the loss from the $96 million alleged in the indictment and reflected in the plea agreements to $140.6 million.  Exhibit F at 3.  During the pendency of this case over the preceding four years, however, the government had never said

6

anything about any $140.6 million; after four years of repeatedly representing that the indictment charged a $96 million Ponzi scheme and expressly excluding certain investments – and after inducing reliance on those representations by inducing plea agreements that reflected a $96 million loss – the government reported to the Court in its letter of September 13, 2017, for the first time, that the total loss in this case against which credits should be applied was *$140.6 million*. See Exhibit F at 3. Rather than properly allocate credits, the government increased loss to neutralize them.

        Even were it possible to hypothesize how such a change in the case could conceivably comport with due process and fundamental fairness, any such *timely* hypothesizing was stymied by the government's legerdemain in making the change. Thus, for example,

> • the government in its letter claimed that it was taking a "conservative approach" to Mr. Callahan's sentencing [*see* Exhibit F at 3], serving to obfuscate the government's deviation from its own earlier and repeated pronouncements that the case charged a $96 million fraud, not one based on $140.6 million;
>
> • the government took this new and dramatically different view of the case in a letter filed on a Wednesday night before Mr. Callahan's Friday sentencing without taking any step to ensure that the Court or Mr. Callahan's then-new counsel fully understood the fact and consequence of the change given the extremely short notice;
>
> • the government in its letter and at sentencing analogized Mr. Callahan to Bernard Madoff and other truly loss-causing defendants and urged imposition of a commensurate term of imprisonment [*see, e.g.,* Sentencing at 46; Exhibit F at 17-21], even as the government knew that it had inflated loss to create the comparison and ensure a severe sentence;
>
> • the government in its letter recited its starting point for its credits-loss analysis as $140.6 million, immediately after a paragraph in which it represented that "Probation holds the defendant accountable for all the money that he took from investors – more than $100 million," thereby creating the erroneous impression that the $140.6 million, mentioned for the first time in the letter, was nothing new [*see* Exhibit F at 3]; and

• the prosecutor cited and relied on the Probation Department's view that the entirety of money invested with Mr. Callahan should be used as loss even though the prosecutor knew that the Probation Department did not draft the indictment and was not privy to the plea agreements, did not thereby induce Mr. Callahan's reliance on those documents, and did not have the same duty as the prosecutor to adhere to the "most meticulous standards of both promise and performance" in honoring its plea agreement that fixed the loss at $96 million.  *See In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999) (*quoting United States v. Lawlor*, 168 F.3d 633, 636 (2d Cir. 1999); *United States v. Wilson*, 920 F.3d at 155 (a guilty plea should be vacated when the prosecutor violates a term of a plea agreement which induced the plea and which the defendant reasonably expected would be honored).

The government's eleventh-hour change in this case to gerrymander a false representation of loss at odds with its indictment, plea agreements and other representations about the case raises more than a garden-variety dispute that can be satisfactorily resolved with legal argument and any necessary fact-finding.  Putting aside the question of whether the particulars of Mr. Callahan's investment business were reasonably foreseeable to Mr. Manson beyond the value of investments in Mr. Manson's Panoramic View (which we address separately), the government has advised counsel that it will press the same $140.6 million at Mr. Manson's sentencing that it pressed at Mr. Callahan's sentencing, despite the $96 million reflected in the indictment, plea agreements, and the government's other pronouncements about this case, on all of which Mr. Manson was entitled to rely in pleading guilty.  The government's position creates a *prima facie* case of a prosecutorial conflict of interest:  it raises a substantial question of conflict between the Office's (1) public role in advancing its cases; and (2) its private interest in insulating itself from personal or professional liability for its success in changing the case against Mr. Callahan, thereby violating basic norms of due process and fundamental fairness and the plea agreement it drafted.

As demonstrated hereinafter in Mr. Callahan's application for bond, Mr. Callahan

8

is already eligible for release under his *correct* Guideline sentence, but he faces additional imprisonment of about a decade because of the government's eleventh-hour change of this case and consequent violations. It is reasonable to question whether and to what extent the government can press its position of a loss of $140.6 million against Mr. Manson without concern for its own personal and professional liability for the improper imprisonment of Mr. Callahan.

This concern is not fanciful. The Second Circuit just two months ago reaffirmed its practice of reassigning a case on remand to a new Judge rather than returning the case to the same judge who imposed sentence despite the government's breach of a plea agreement. *See United States v. Wilson*, 920 F.3d at 168. The Circuit's concern that such a judge would find it "difficult to erase" the effects of a breached plea agreement [*Wilson*, 920 F.3d at 168], would presumably be greater when considering the conflict of a prosecutor interested in defending a claimed breach that resulted in an inflated Guideline range and more imprisonment than should have been imposed. More is at stake now than a *post-mortem* of a concluded case.

It is no answer that Mr. Callahan was represented at sentencing by a lawyer. Mr. Callahan's pending Petition claims ineffective assistance of his counsel at sentencing precisely because counsel did not and could not possibly have fully understood all the consequences of the government's letter of September 13, 2017, on little more than a day's notice before Mr. Callahan's sentencing; had defense at least sought an adjournment, he would have had time to consider the case with care and realize that the government's letter served to increase loss to neutralize credits, not a garden-variety Guidelines dispute. The lawyer who represented Mr. Callahan at sentencing is an experienced member of the Bar, but his principal

mistake in this case, which we urge the Court not to replicate, was to assume that he could reasonably rely on the work of the case agent and the government's consequent representations. In fact, without the benefit of a proper contemporaneous objection, the Court at sentencing *commended* the prosecutor for his letter to the Court of September 13, 2017, which constituted the breach [Transcript at 59], and despite the prosecutor's failure to call the Court's attention to and explain how it could advance a new view of the case in irreconcilable conflict with the government-drafted indictment and in violation of the government-drafted plea agreement.

To permit the government to continue in this case is to risk entrusting the fox with an inventory of the looted henhouse.  The government's conduct of this case may well be a sign of the times animating Cole Porter's sentiment about devolving norms, but it no less jeopardizes the reliability of fact-finding and the fairness of proceedings in this case going forward and is no less unacceptable.  The government's success in getting us to this point does not necessarily mean that we should be here, or that we can or should try to justify the road taken.  Anything, most certainly, should not go.

B.     This United States Attorney's Office is Conflicted

Prosecutors are no different from other lawyers in that they may face a circumstance which creates a conflict of interest.  Though circumstances requiring disqualification are rare, so too is this case:  there appears to be no case with even remotely similar facts.  Here, the government succeeded in pressing an exaggerated Guideline range with nominal notice to Mr. Callahan that was wholly inadequate in the extreme and which resulted in a massive change to the indictment and the plea agreement.  More, the government's change brought conduct into this case that the government had expressly alleged in the indictment was

not criminal, not induced by fraud and not part of the loss reflected in the plea agreement. The consequence is that Mr. Callahan has already served time in prison for his crime as required by his *correct* Guideline range and now remains imprisoned for non-criminal conduct of which he is *actually innocent, according to the indictment*; the government's continued persistence in its position threatens Mr. Manson with the same unacceptable and unconstitutional result.

For these reasons, this application raises a *prima facie* case of an actual conflict of this United States Attorney's Office between its public role in prosecuting a case and its personal interests in defending itself from personal or professional responsibility for a position in this case that continues severely to prejudice one defendant, is plainly irreconcilable with the indictment and the plea agreements, and about which the government did not properly alert the Court. *See, e.g.,* American Bar Association Model Rule of Professional Conduct 1.7(a)(2) and New York Rule of Professional Conduct 1.7 (a lawyer shall not represent a client if the representation will be materially limited by a personal interest); Commentary to ABA Rule 1.7 ("if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice); ABA Standard 3-1.4 (the prosecutor has a heightened duty of candor to the courts).

While "[a]n entire U.S. Attorney's Office should only be disqualified, if ever, when special circumstances demonstrate that the interest of justice could only be advanced by this drastic remedy" [*see United States v. Basciano*, 763 F. Supp. 2d 303, 314 (E.D.N.Y. 2011), *aff'd*, 634 F. App'x 832 (2d Cir. 2015)], a District Judge "retains broad discretion in deciding a motion to disqualify." *See McLenton v. Menifee*, No. 05 CV 2844 (JGK), 2006 WL 2517002 at *1 (S.D.N.Y. Aug. 29, 2006) *(citing Cheng v. GAF Corp.*, 631 F.2d 1052, 1055 (2d Cir. 1980)

(collecting cases), *vacated on other grounds*, 450 U.S. 903 (1981)). The extreme remedy of disqualification of a United States Attorney's Office requires a showing of prejudice if not actual bad faith or misconduct [*see United States v. Ramirez*, No. 03 CR 1079 (Judge Kram), 2004 WL 203034, at *3 (S.D.N.Y. Feb. 2, 2004)], which has been made here and renders any other remedy insufficient. This application presents a *prima facie* case that this United States Attorney's Office is conflicted. *See, e.g., United States v. Heldt*, 668 F.2d 1238, 1276 n. 80 (D.C. Cir. 1981) (prospective civil liability for acts undertaken in a criminal matter would require proof by clear and convincing evidence of a *prima facie* case of misconduct justifying disqualification).

While disqualification of the entire Office might be justified by just the fact of the assigned prosecutor's supervisory position (as opposed to disqualification of just the assigned prosecutor), it is otherwise justified here by the fact of review of this case by the Chief of the United States Attorney's Criminal Division and his representation to defense counsel that he had discussed the case with other senior executives and had decided to press the government's stated position despite the breach and concomitant violations.

C.      Second Circuit Law Favors Reassignment of this Case to Another Judge

In Mr. Callahan's Petition, we asked Your Honor to consider recusal under the circumstances of this case. *See* Petition at 4-5. We again urge that relief for the following additional reason.

In *Wilson*, 920 F.3d at 155, a case decided just two months ago, the Second Circuit reaffirmed its practice of reassigning cases on remand upon finding breach of a plea agreement:

> In cases where specific performance is the appropriate remedy, we typically

12

remand the case for resentencing before a different district judge because the effect of the government's breach of its commitment is difficult to erase and it is likely that the same judge would reach the same result as he reached before.

*Wilson*, 920 F.3d at 168 (citation and quotation marks omitted). The Court expressed its confidence in Judge Garaufis to sentence that defendant appropriately, but ruled it appropriate to reassign the case.

The procedural posture of this case is not identical to *Wilson*, but the reasoning favoring assignment to another Judge is the same. Here, the Court has already sentenced one defendant, Mr. Callahan, on the basis of a Guideline range pressed by the government in violation of that defendant's plea agreement, and the government seeks to do the same to Mr. Manson. The Court expressly *commended* the prosecutor for his letter of September 13, 2017 [Transcript at 59], in which the prosecutor announced his position constituting the breach. Under *Wilson*, the case should be reassigned for both Mr. Callahan's pending Petition and Mr. Manson's sentencing.

D. The Government Has Breached Its Plea Agreement with Mr. Manson for the Same Reasons that Mr. Callahan's Waiver of Post-Conviction Remedies is Invalid

*1. The Government Should Be Ordered to Honor its Agreement with Mr. Manson*

A guilty plea should be vacated when the government violates a term of a plea agreement which induced the plea and which the defendant reasonably expected would be honored. *See United States v. Wilson*, 920 F.3d at 155; *United States v. Palladino*, 347 F.3d 29 (2d Cir. 2003) (vacating guilty plea where government at sentencing changed a term in the plea agreement on which the defendant relied.

A sentence imposed pursuant to a plea agreement "must follow the reasonable understandings and expectations of the defendant with respect to the bargained for sentence." *Id*

13

at 33; *Wilson*, 920 F.3d at 165 (a guilty plea is properly vacated where the government's change of position causes "serious unfairness" to the defendant and changed his "exposure so dramatically"). As the Honorable Jack B. Weinstein recently noted, "[b]ecause of the prevalence of plea agreements and the absence of arm's-length negotiation of the terms by parties of equal power, courts must review such agreements closely to ensure that defendants' rights are not crushed by the government's power." *United States v. Chua*, 349 F. Supp. 214, 218 (E.D.N.Y. 2018) (Weinstein, J). "[B]ecause plea bargains require defendants to waive fundamental constitutional rights, prosecutors are held to meticulous standards of performance . . . . [W]e construe plea agreements strictly against the government and do not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standards of fairness." *Wilson*, 920 F.3d at 162 (citations and quotation marks omitted). *See also In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999) (requiring district judges to hold the government to the "most meticulous standards of both promise and performance").

Mr. Manson's plea agreement put him on notice of the government's view that he was accountable for the $96 million fraud with which it charged Mr. Callahan. While Mr. Manson disagrees that he was accountable for Mr. Callahan's fraud beyond investments in the Panoramic View (valued at $38 million, according to the government), he knew that even the $96 million would be offset by the value of redemptions to Mr. Callahan's investors and sale of the Panoramic View. *See United States v. The Real Property Located at 272 Old Montauk Highway, Montauk, New York, et al.*, 12 CV 1880 (E.D.N.Y. Feb. 22, 2014) (Document 69 at 19) (Judge Spatt noted in the months just before the guilty pleas that the Panoramic View was then being marketed and had an estimated value of between $52 million and $88 million).

14

"In general, the remedy for a breached plea agreement is either to permit the plea to be withdrawn or to order specific performance of the agreement." *United States v. Vaval*, 404 F.3d 154 (2d Cir. 2005). The circumstances of this case favor holding the government to its estimate of loss, rather than permitting Mr. Manson to withdraw his guilty plea. As explained in the memorandum in aid of Mr. Manson's sentencing independently filed, he assisted the government in selling the Panoramic View for the benefit of investors, managing it on-site for a period of years, as he agreed as part of his guilty plea, to preserve it for the benefit of victims. The government sufficiently entrusted Mr. Manson to protect the Panoramic View, the principal asset at issue in this case, by delegating that duty to him without supervision. In the presence of undersigned counsel, the government expressly commended Mr. Manson for his diligence and excellence in maintaining the property. As the government acknowledges [Exhibit F at 4], it sold the property and was able to recoup more money for victims than was fraudulently diverted to the property, even after payment of mortgages and associated debts. In addition, Mr. Manson agreed to pay an additional $2.5 million to the government and forfeit $1.4 million in bank accounts. Mr. Manson fulfilled his part of the bargain; the government should be ordered to honor its part.

While Mr. Manson might opt to withdraw his guilty plea rather than face sentencing under an exaggerated Guideline range at odds with his plea agreement, he is entitled to the benefit of his bargain.

2. *For the same reasons, Mr. Callahan's Waiver is Invalid*

For the same reasons, the government violated its plea agreement with Mr. Callahan, invalidating its constituent waiver of post-conviction remedies. As Judge Weinstein has noted, a defendant "must have real notice of the true nature of the charge for a waiver to be

effective." *United States v. Chua*, 349 F. Supp. 3d at 218 (*quoting Frederick v. Warden, Lewisburg Corr. Facility*, 308 F.3d 192, 195-96 (2d Cir. 2002) (quotation marks omitted). A guilty plea (and thus its constituent waiver of post-conviction remedies) should be vacated where the government at sentencing changes a term on which the defendant reasonably relied based on information known to the government at the time of the plea. "A sentence imposed pursuant to a plea agreement "must follow the reasonable understandings and expectations of the defendant with respect to the bargained for sentence." *See United States v. Palladino*, 347 F.3d at 33 (*quoting United States v. Ferrara*, 954 F.2d 103, 105 (2d Cir. 1992).

   A waiver of appeal is invalid where the government violates a plea agreement, especially here where (1) the government induced reliance on its repeated representation that the case charged a $96 million fraud; (2) by the time of the guilty plea, the government had expressly excluded from the case investments which it added back for sentencing; and (3) Mr. Callahan's counsel at the guilty plea failed to advise him that the plea agreement permitted the government at sentencing to change the case and argue for a different loss than in the plea agreement.

   As Mr. Callahan's explains in his Declaration submitted with his Petition, he knew from counsel who represented him at his plea that the government's alleged loss of $96 million would be reduced by credits after the Panoramic View was sold and once the value of redemptions was determined. Mr. Callahan was not advised and had no reason to believe that the government could deal with credits by increasing loss to neutralize them.

   The government may not be permitted to insulate itself from violation of a plea agreement by arguing that a defendant's sentence was less than the term of months associated with the waiver. It is not permissible for the government to cherry-pick the provisions of a plea

16

agreement, rely on one provision to defend against a claimed breach, while ignoring the context provided by other provisions and the defendant's reasonable expectations induced thereby. As explained in greater detail in Mr. Callahan's Petition, his counsel's ineffectiveness and the circumstances of this case invalidated any waiver of post-conviction remedies as unknowing and involuntary. *See, e.g., Garza v. Idaho*, 139 S. Ct. 738, 752 (2019). "[W]e temper the application of ordinary contract principles with special due process concerns for fairness and the adequacy of procedural safeguards . . . . [and so] construe plea agreements strictly against the Government." *United States v. Lutchman*, 910 F.3d 33, 37 (2d Cir. 2018) (*quoting United States v. Riggi*, 649 F.3d 143, 147 (2d Cir. 2011); *United States v. Podde*, 105 F.3d 813, 820 (2d Cir. 1997) ("we remain suspicious of the application of contract law doctrine in favor of the prosecution" in light of the practice of construing plea agreements against the government).

E.  The Court Should Grant Bond to Mr. Callahan Pending Resolution of His Petition

Based on Mr. Callahan's pending Petition and the filings made today, Mr. Callahan should be granted bond pending resolution of his Petition.

*1. Under the Correct Guideline Range, Mr. Callahan is Now Eligible for Release*

Mr. Callahan was sentenced to a term of imprisonment of 144 months on an erroneous Guideline range of 151 to 188 months. In fact, his correct Guideline range is an adjusted offense level 14, Criminal History Category I, corresponding to 15 to 21 months:

    Base Offense Level [§2B1.1(a)(1)]    7

    Plus    More than Ten Victims [§2B1.1(b)(2)(C)]    +2

    Plus    Sophisticated Means [§2B1.1(b)(1)(C)]    +2

    Plus    Investment Advisor [§2B1.1(b)(19)(A)(iii)]  +4

   Plus  Aggravating Role [§3B1.1(c)]    <u>+2</u>

   Minus Acceptance of Responsibility    14

Under the correct Guideline range, Mr. Callahan is currently and has been eligible for release, at least to a halfway house. He is not a risk of flight nor does he present any danger to the community. From the time of Mr. Callahan's arrest in 2013 until his surrender in early 2018, he was fully compliant with the terms of his release. He has at least seven suretors ready and willing to sign a substantial bond secured by multiple properties.

  *2. The Second Circuit Permits Bond on a Pending Petition Pursuant to Section 2255*

  The Second Circuit has made clear that bond may be granted to a Petitioner awaiting decision on a pending petition pursuant to 18 U.S.C. §2255. *See Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001). Mr. Callahan's Petition raises a substantial claim and precisely the type of extraordinary circumstance that "make the grant of bail necessary to make the habeas relief effective." *Illarramendi v. United States*, 906 F.3d 268, 271 (2d Cir. 2018) (citing *Mapp*). As Mr. Callahan's Petition and this supplement demonstrate, his lawyer was ineffective in not seeking redress for the government improper inflation of loss from $96 million to $140.6 million in order to neutralize applicable credits. Counsel failed to challenge the issue, argue that the government's position was at odds with the indictment and Mr. Callahan's plea agreement and was thus a violation of basic norms of due process and fundamental fairness.

F.  <u>The Court Should Permit Mr. Callahan to Amend His Petition</u>

  While Mr. Manson is able to rely on the accompanying analysis of the government's spreadsheet by Mazars in challenging the government's view of loss at his upcoming sentencing, Mr. Callahan was sentenced without the benefit of the spreadsheet or the

18

analysis.

After Mr. Callahan filed his Petition, the Chief of the United States Attorney's Criminal Division responded to defense counsel's expressed concern about this case by asking the assigned prosecutor to provide defense counsel with the government's spreadsheet underlying the government's view of loss.  Defense counsel immediately engaged Mazars, which analyzed the spreadsheet, properly allocated credits to loss, and concluded just within the past few weeks that applicable credits exceed loss.

As part of that analysis, Mazars analyzed the fair market value of at least some of the services associated with the investments acknowledged by the government to be non-criminal and proper.  Under the Guidelines, that value represented a credit.  U.S.S.G. §2B1.1 (2013) *Commentary*, Application Note 3(E)(i) (providing for certain credits against loss whether or not a defendant is entitled to retain the value of the credits).  Mazars estimated a total of $3,401,238 of management and incentive fees associated with Mr. Callahan's legitimate investments.  Exhibit A.  Mr. Callahan's counsel at sentencing did not press this credit at sentencing, contributing to the prejudice to Mr. Callahan.  This credit helped establish the fact of a gain.  Counsel was ineffective in failing to seek the credit.

Mr. Callahan should be permitted to supplement his Petition with the government's disclosure and the subsequent analysis conducted by Mazars.  *See* 28 U.S.C.A. §2242 (permitting petitions pursuant to Section 2255 to be supplemented as provided in the Federal Rules of Civil Procedure); Fed. R. Civ. P. 15(a)(2) (leave of the Court to amend should be given freely where justice requires); Fed..R. Civ. P. 15(d) (a party may permit a pleading with transactions, occurrences or events that occurred after the date of the original pleading).

<u>Conclusion</u>

For these reasons, we respectfully request that the Court issue orders:

1. Disqualifying this United States Attorney's Office in Favor of Another;

2. For Recusal and Reassignment of this Case to Another Judge;

3. Permitting Mr. Callahan to Supplement His Pending Petition;

4. Requiring the Government to Honor its Plea Agreement with Mr. Manson; and

5. Granting Bond to Mr. Callahan Pending Resolution of His Petition.

Dated: June 19, 2019

Respectfully submitted,

/s/
Andrew J. Frisch
The Law Offices of Andrew J. Frisch
One Penn Plaza, Suite 5315
New York, New York 10119
(212) 285-8000
afrisch@andrewfrisch.com

*Attorney for Brian Callahan and Adam Manson*