

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

CCC:ALC

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 19, 2019

BY ECF

The Honorable Arthur D. Spatt
Senior United States District Judge
United States District Court
Eastern District of New York
1020 Federal Plaza
Central Islip, New York 11722

        Re:    United States v. Brian Callahan, et al.
                 Criminal Docket No. 13-453 (ADS)

Dear Judge Spatt:

       The government respectfully submits this letter in opposition to the motions filed on June 19, 2019 in the above-captioned case by counsel for the defendants Brian Callahan and Adam Manson, which sought, among other things: (1) specific performance of Manson's plea agreement with the government; (2) invalidation of the plea waiver in Callahan's plea agreement; (3) an order disqualifying the U.S. Attorney's Office for the Eastern District of New York (the "Office") from prosecuting this case; and (4) permission to supplement Callahan's pending petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2255 (the "habeas petition"). See ECF Docket No. 206-1 (hereinafter "Def. Mot."). The government does not oppose the fourth motion, i.e., Callahan's motion to supplement his pending habeas petition. However, for the reasons set forth below, the defendants' remaining motions are wholly without merit and should be denied in their entirety.

I.       Factual Background

       A.       Overview of the Investigation

       Between 2005 and 2012, Callahan operated a large-scale Ponzi scheme. (PSR ¶¶ 8, 10-35, 39.) Callahan took more than $100 million from dozens of investors purportedly to invest in hedge funds, stocks, bonds and other investment vehicles. (Id.). However, unbeknownst to investors, Callahan used those funds to pay redemptions to prior investors, to pay himself $6 million, and to purchase and renovate the Panoramic View, a cooperative development in Montauk, New York in which he, personally, had a 50 percent ownership interest.

(Id.). Callahan's criminal conduct caused his investors to lose more than approximately $19.7 million. (Id.).

During his fraudulent scheme, Callahan employed numerous deceitful tactics to keep his Ponzi scheme afloat. (PSR ¶¶ 26-35). Indeed, he created fictitious documents that he provided to investors, auditors and banks, including fictitious account statements, balance sheets, closing statements and promissory notes. (Id.). He also forged people's signatures. (PSR ¶¶ 27-28). He even stole a person's identity to conceal his misuse of investor monies from the auditors. (PSR ¶ 27).

Manson is Callahan's brother-in-law. He formed two real estate corporations, Distinctive Investments LLC ("Distinctive Investments") and Distinctive Ventures, LLC ("Distinctive Ventures"), which he managed. Manson and Callahan owned and managed Distinctive Investments and controlled Distinctive Ventures. (PSR ¶ 9).

Manson assisted Callahan in carrying out the scheme by, among other things, handling the purchase of the Panoramic View with investor money, lying to banks in connection with that transaction and lying to auditors in order to enable Callahan to continue defrauding investors.

For their conduct, a grand jury sitting in the Eastern District of New York returned a 19-count indictment charging Callahan and Manson variously with securities fraud, wire fraud, conspiracy to commit securities fraud, conspiracy to commit wire fraud and aggravated identity theft.

B. The Defendants' Guilty Pleas

1. Callahan

On April 29, 2014, Callahan pleaded guilty, pursuant to a plea agreement, to securities fraud and wire fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff and 18 U.S.C. § 1343, respectively. Paragraph 2 provided the government's estimate of the applicable United States Guidelines, including a loss enhancement of more than $50,000,000 but less than $100,000,000, resulting in a Guidelines range of imprisonment of 235 to 293 months. (Id.). Paragraph 3 of the plea agreement explained:

> The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

(Exh. 1 ¶ 3). Callahan agreed "not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 327 months or below." (Id. ¶ 4). Furthermore, Callahan

2

agreed that "[t]his waiver is binding without regard to the sentencing analysis used by the Court." (Id.).

In exchange, the government agreed (1) to dismiss the remaining counts in the indictment, (2) not to bring further criminal charges against Callahan for his defrauding investors, auditors, banks and the Internal Revenue Service, (3) to take no position concerning where within the Guidelines range determined by the Court the sentence should fall, and (4) to make no motion for an upward departure under the Guidelines. (Exh. 1 ¶ 5).

At no point during the plea hearing did the parties or the Court discuss the government's methodology for calculating loss for purposes of the advisory Guidelines estimate. Nor did the parties or the Court address whether the government was applying any credits or offsets in calculating loss, and if so, which credits or offsets the government had applied.

    2.    <u>Manson</u>

Manson pleaded guilty, pursuant to a plea agreement, on May 12, 2014, to one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Like Callahan's, Manson's plea agreement included, as part of its Guidelines estimate, a loss enhancement of more than $50,000,000 but less than $100,000,000. The resulting advisory Guidelines range was estimated to be resulting in a Guidelines range of imprisonment of 121 to 151 months' imprisonment. However, because the statutory maximum for the offense of conviction was five years' imprisonment, the advisory Guidelines range became 60 months. Manson's plea agreement contained the same language as Callahan's regarding the non-binding nature of the Guidelines estimate, and the same appellate waiver language, although the appellate waiver was triggered by the Court's imposition of "a term of imprisonment of 60 months (the statutory maximum) or below."

As with Callahan's plea hearing, there was no discussion at Manson's plea hearing of the government's loss calculation methodology or the application of any credits or offsets to the loss amount.

    C.    <u>Callahan's Presentence Investigation Report ("PSR")</u>

The United States Probation Department ("Probation") prepared and submitted the PSR on December 16, 2015. Probation concluded that Callahan's advisory Guidelines offense level was 40 and he was in criminal history category I, resulting in a range of imprisonment of 292 to 365 months. (PSR ¶¶ 45-57, 90). Probation used intended loss as its methodology for calculating the loss amount applicable to the scheme, a decision that resulted in a higher advisory Guidelines range than what had been estimated in Callahan's plea agreement. Probation arrived at an adjusted offense level of 40 by using a base offense level of seven (U.S.S.G. § 2B1.1(a)(1)), adding 26 levels because Callahan was running a Ponzi scheme, took more than $100 million from investors during that scheme and therefore intended to cause that much loss (U.S.S.G. § 2B1.1(b)(1)(N)), adding two levels because Callahan victimized ten or more people (U.S.S.G. § 2B1.1(b)(2)(A)), adding four levels because Callahan was an investment advisor (U.S.S.G. § 2B1.1(b)(17)(A)(iii)), adding two levels because Callahan employed sophisticated means (U.S.S.G. § 2B1.1(b)(10)), adding two levels for being an

3

organizer, leader, manager or supervisor (U.S.S.G. § 3B1.1(c)), and subtracting three levels for timely acceptance of responsibility (U.S.S.G. §§ 3B1.1(a), (b)). (PSR ¶¶ 45-57).

Callahan raised three objections to Probation's calculation in a letter filed ten days prior to the sentencing. See Callahan's Sentencing Mem., dated Sept. 5, 2017, ECF Docket No. 155, at 29-39. For purposes of the instant Motions, the only relevant objection is Callahan's objection to the loss enhancement, which he claimed was at most $2.8 million. Id. at 39.

        D.        The Government's Conservative Loss Calculation for Callahan's Sentencing

The government filed its detailed, 24-page letter in response to Callahan's 127-page sentencing submission a prompt eight days after the defense submission was filed. In the government's sentencing letter, the government also objected to Probation's loss figure. As is evident from the government's sentencing letter, the government advocated for using a much more conservative loss calculation methodology than Probation had. As the government stated in its letter, rather than holding Callahan accountable for his intended loss (i.e., all the monies he took from investors during his Ponzi scheme), the government argued that the loss enhancement should be limited to the actual loss that Callahan's criminal conduct caused. Further, the government was extraordinarily liberal in choosing which offsets to deduct from the actual loss calculation, including all redemptions Callahan paid to prior investors and monies that the government recouped when it sold all the seized assets (including the Panoramic property). Specifically, the government wrote the following in its sentencing letter:

> Probation holds the defendant accountable for all the money that he took from investors—more than $100 million--on the theory that he was running a Ponzi scheme and therefore intended to cause that much loss. (PSR ¶ 39.) While that theory is viable, <u>the government has decided to take a more conservative approach and will use the actual loss that the defendant caused</u>. After giving the defendant credit for (1) net proceeds from the sales of the Panoramic and 47 Clock Tower, (2) investor monies recovered by the Receiver in the SEC action, (3) any legitimate market losses and (4) redemptions paid to investors, the government concluded that the defendant caused $19.7 million in loss--this is for Guidelines purposes only, the amount of restitution is $67.6 million. The government calculated the actual loss as follows:

| Total money received from investors | $140.6 million |
|---|---|
| Redemptions paid to prior investors | $74 million |
| Monies recovered by the Receiver | $6.4 million |
| Net proceeds from sale of 47 Clock Tower | $139 thousand |
| Net proceeds from the sale of the Panoramic | $40.3 million |
| *Actual Loss* | $19.7 million |

Gov't's Sentencing Letter, dated Sept. 13, 2017, ECF Docket No. 158, at 3 (emphasis added).

Ultimately, what remained was a $19.7 million loss figure—far below the loss amount range ($50 million to $100 million) used in both Callahan's and Manson's plea

4

agreements. Using that loss amount, Callahan's advisory Guidelines range of imprisonment became 151 to 188 months—far lower than the 235-to-293-month range estimated in Callahan's plea agreement.

The government respectfully requested that the Court impose a sentence within the advisory Guidelines range—151 to 188 months—as opposed to the sentence of one year and one day that Callahan had requested in his submission.
.
Following the filing of the government's sentencing letter, on September 14, 2017, Probation issued an addendum to the PSR reducing the loss enhancement to $19.7 million. (PSR Add. ¶ 46).

    E.    Callahan's Sentencing

On September 15, 2017, Callahan appeared for sentencing. After hearing extensive arguments from defense counsel and the government regarding the appropriate loss calculation, the Court rejected Callahan's argument and agreed with the government and Probation that Callahan caused $19.7 million in loss. (Sentencing Tr. at 11-13, 15, 44-46, 62). After also allowing Callahan's father, his wife, a family friend, defense counsel, Callahan, the government and several victims to be heard regarding the appropriate sentence to be imposed, the Court sentenced Callahan to 144 months' incarceration—a variance below the applicable advisory Guidelines range. (Id. at 8-66). Before imposing the sentence, the Court first considered the Guidelines range of 151 to 188 months, acknowledging that while the Court must consider the Guidelines, those Guidelines were not mandatory. (Id. at 62-63). Next, the Court thoroughly examined each of the factors set forth in 18 U.S.C. § 3553(a). In fashioning a just sentence, the Court credited some of Callahan's mitigating arguments, including his failed attempts at cooperation and the business that his wife started after Callahan was arrested. (Id. at 65-66).

    F.    Callahan's Appeal and Habeas Petition

Callahan appealed from the Court's judgment and challenged his sentence, arguing, among other things, that the government changed its theory of loss. The government moved to dismiss the defendant's appeal. On December 28, 2017, the Second Circuit dismissed the defendant's appeal on the ground that the defendant had waived his right to appeal if he received a sentence of imprisonment of 327 months or below.

On September 28, 2018, Callahan filed his habeas petition, which remains pending. Callahan's petition alleged that the government violated his plea agreement by falsely representing to the Court the amount of loss caused by his behavior at the sentencing hearing. Specifically, he alleged that the government initially agreed that he caused $96 million in fraud losses, but, two days before the sentencing hearing, changed its calculation to $140.6 million. Callahan claimed that the government increased the estimate to avoid the fact that he was entitled to substantial credits against the loss, which exceeded its initial estimate of fraud loss and would have resulted in a significantly diminished range of 15-to-21 months under the Sentencing Guidelines. Finally, in addition to these claims, Callahan alleged that his sentence was unconstitutional due to the government's conduct.

5

G.      Status of Manson's Case

As a result of several requests for adjournments by the parties, Manson has not yet been sentenced.

H.      The Instant Motions

On June 19, 2019, defense counsel filed the instant motions on behalf of both defendants. Defense counsel claims that the government had committed to a $96 million loss figure based on the allegations in the Indictment and statements made in the Office's press releases about the case, but then shifted its loss calculation impermissibly in its sentencing letter, filed two days before Callahan's sentencing. Defense counsel further claims that the government inflated the total loss amount so as to neutralize any credits that would offset the loss amount. (Br. at 6-7). On this basis, defense counsel claims that the government breached its plea agreement with Callahan, that Callahan's plea waiver accordingly should be invalidated, and that Manson's plea agreement—purportedly contemplating a $96 million loss figure—should be enforced by the Court.

In addition to the motions to enforce the terms of Manson's plea agreement with the government, disqualify the Office from further prosecuting this case and supplement Callahan's pending habeas petition, defense counsel moved for Callahan to be released on bond pending a decision on his habeas petition and recusal of the Court from presiding over this case. Those latter two motions were denied in a separate order entered by the Court on July 31, 2019. See Order dated July 31, 2019, ECF Docket No. 216. Accordingly, the government does not address those motions, which are now moot, herein.

II.      Argument

As explained in further detail below, the government acted in good faith throughout the proceedings in this case and adopted a conservative approach at Callahan's sentencing. There is absolutely no basis to conclude that the government breached its plea agreement with Callahan or to order the government to comply with its plea agreement with Manson.

A.      The Government Has Honored Its Plea Agreement with Callahan and the Court Need Not "Enforce" the Terms of Manson's Plea Agreement

1.      Applicable Law

Allegations of breached plea agreements depend on what "the reasonable understanding and expectations of the defendant [were] as to the sentence for which he had bargained." Paradiso v. United States, 689 F.2d 28, 31 (2d Cir. 1982) (per curiam). Plea agreements are construed "strictly against the government," and the Second Circuit does not "hesitate to scrutinize the government's conduct to ensure that it comports with the highest standards of fairness." United States v. Vaval, 404 F.3d 144, 152 (2d Cir. 2005) (quoting United States v. Lawlor, 168 F.3d 633, 637 (2d Cir. 1999)) (internal quotation marks omitted).

6

In assessing whether the government has breached a plea agreement, courts must attempt to resolve the tension between, on the one hand, "defendants' reasonable reliance on the sentences as estimated in their plea agreements, and, on the other, the Government's need to maintain flexibility in its sentencing decisions in the event of mistakes, oversights, or new information." United States v. Wilson, 920 F.3d 155 (2d Cir. 2019) (quoting United States v. Habbas, 527 F.3d 266, 269-72 (2d Cir. 2008)) (internal quotation marks omitted). In doing so, the court should "look both to the precise terms of the plea agreements and to the parties' behavior." Id.

In the specific context of an alleged breached advisory Guidelines range estimate, "the Government does not violate a defendant's reasonable expectations simply because it deviates from the estimate." Id. A defendant's reasonable expectations may be breached, however, "where the Government's deviation produces serious unfairness for the defendant," including if Habbas, 527 F.3d at 271. This may occur if, for instance, the Government acts in bad faith (either in its initial calculation of the Pimentel estimate or in its later change of position) or if "the [G]overnment's change of position (without new justifying facts) changed the defendant's exposure so dramatically as to raise doubts whether the defendant could reasonably be seen to have understood the risks of the agreement." Id. (quoting Habbas, 527 F.3d at 271) (internal quotation marks and brackets omitted).

With respect to an appellate waiver, "[i]n general, a defendant's knowing and voluntary waiver of [the] right to appeal a sentence within an agreed guideline range is enforceable." United States v. Rosa, 123 F.3d 94, 97 (2d Cir. 1997). A defendant's waiver of his right to appeal will not be enforced, however, "if the Government breaches the plea agreement." United States v. Garcia, 166 F.3d 519, 521 (2d Cir. 1999).

2. Discussion

The government at all times operated in good faith with respect to its plea agreements with Callahan and Manson and in connection with Callahan's sentencing, and there is no merit to defense counsel's argument that the government breached its plea agreement with Callahan or needs to be ordered to comply with its agreement with Manson.

What is eminently clear from the face of the plea agreements for both defendants and from their plea transcripts is that the only reasonable expectation the defendants could have had regarding the loss calculation at the time of their pleas was that the loss amount would be between $50 million and $100 million. Both the plea agreements and the plea colloquies were completely silent on the issue of possible credits to be deducted from the loss amount, and indeed, defense counsel has proffered no basis whatsoever to conclude the defendants reasonably had an offset amount in their minds when they pleaded guilty.

Furthermore, although the defendants now challenge the government's loss calculation for Callahan's sentencing because they want redemption credits applied differently, they could have had no expectation at the time of their guilty pleas that the government would offset redemptions when calculating loss. The reason for this is simple: the redemption totals were known to both the government and the defense at the time of the pleas. Accordingly,

taking as true the defendants' representation that they believed $96 million to be the starting point for the government's loss analysis at the time of their pleas, they could not have also believed that the government was deducting redemptions in its loss calculation, because if the government had done so, its loss bracket under U.S.S.G. § 2B1.1 would have been below $50 million, rather than $50 million to $100 million. This point alone defeats the defendants' argument that their reasonable expectations at the time of their pleas have been violated (in Callahan's case) or will be violated (in Manson's case) by the government at sentencing.

The argument that the parallel civil forfeiture case regarding the attempts to sell the Panoramic property for tens of millions of dollars somehow instilled the defendants with the expectation that the potential proceeds of the sale of that property would be deducted from any loss amount at sentencing defies common sense. The Guidelines themselves should have defeated any such expectation given that the sale of the Panoramic property did not occur until well after the defendants' offenses were detected and the instant prosecution began. The fact that the government ultimately decided to reduce the loss amount by the sale proceeds of the Panoramic property when the Guidelines do not even provide for such a deduction should not now be used against the government, opportunistically, for purposes of the instant Motions. Rather, the application of credits not contemplated by the Guidelines can only be read as a sign of the government's good faith in these proceedings.

In addition, the government's approach to applying credits for all redemptions to the defendants' investors necessarily required starting from all of the money the defendants took in from investors (not limited to just certain funds in the charged scheme), reduced by all money given back to investors (again, not limited to just certain funds in the charged scheme). The government's approach to reducing the loss amount accurately and completely by all redemptions was taken in good faith and designed to arrive at a conservative loss amount.

Importantly, the result of the government's attempt, following the release of the PSR (recommending the use of an intended loss amount that exceeded $100 million), to arrive at an accurate, appropriate and conservative loss amount resulted in a much lower advisory Guidelines range of imprisonment being used at Callahan's sentencing (151 to 188 months) than was estimated in Callahan's plea agreement (235 to 293 months). The simplest and most common-sense explanation for former counsel for Callahan's approach at sentencing is that he recognized that this difference in Guidelines ranges greatly favored Callahan. And ultimately, the Court imposed a sentence even below the more favorable Guidelines range. Accordingly, Callahan has demonstrated neither bad faith by the government nor prejudice to himself as a result of the alleged shift in loss amount from the time of the plea to the time of sentencing.

The government also notes that it contests the accuracy of the Mazars loss calculation analysis pressed by defense counsel in the Motions. Specifically, Callahan and Mazars incorrectly excluded $21.9 million that Callahan raised for one of his funds, namely, Pangea. The government included those monies in its own loss calculation because Callahan plainly used those funds to further his fraudulent scheme. As alleged in the indictment, Callahan used Pangea funds to purchase the Panoramic View and to make several monthly loan payments for that property. (Ind. at ¶14, ¶17). He further used new Pangea funds to pay himself, to pay redemptions to prior investors, and even used monies from his other funds to pay redemptions to Pangea investors. (Id. at ¶ 17). Accordingly, the government correctly included monies raised

8

for the Pangea fund and all monies raised when calculating loss. The government's approach to reducing the loss amount accurately and completely was taken in good faith and designed to arrive at a conservative loss amount. The Court need not, however, resolve the differences between the government's analysis and that of Callahan and Mazars because, as argued above, there was no violation of Callahan's "reasonable understanding and expectations" as to his advisory Guidelines range, as informed by the government's statements in his plea agreement and at his plea allocution.

With respect to Manson's upcoming sentencing, the government respectfully submits that the same loss calculation as applied at Callahan's sentencing should be applied at Manson's. There is no basis to require the government to adopt the defendants' alternative loss calculation for purposes of Manson's sentencing when there could have been no expectation by Manson, based on the plea agreement and the discussion at the plea colloquy, that any credits would be deducted from the loss amount estimated in the agreement. Moreover, the Court clearly has discretion to make findings at Manson's sentencing as to the appropriate Guidelines calculation, and has the freedom ultimately to sentence Manson below whatever advisory Guidelines range the Court deems correct. There is therefore no reason to preemptively order the government to be bound by defense counsel's Guidelines calculation, and Manson's motion for "specific performance" of his post hoc interpretation of the plea agreement should be denied.

Further, because there has been no breach of Callahan's plea agreement, his appellate waiver remains enforceable.

B. There Is No Basis To Disqualify the United States Attorney's Office

In his motions, defense counsel also argues that the government's position in this case "creates a *prima facie* case of a prosecutorial conflict of interest: it raises a substantial question of conflict between the Office's (1) public role in advancing its cases; and (2) its private interest in insulating itself from personal or professional liability for its success in changing the case against Mr. Callahan, thereby violating basic norms of due process and fundamental fairness and the plea agreement it drafted." (Br. at 8). Defense counsel further contends that "[i]t is reasonable to question whether and to what extent the government can press its position of a loss of $140.6 million against Mr. Manson without concern for its own personal and professional liability for the improper imprisonment of Mr. Callahan." (Id. at 9). Defense counsel's arguments are completely without merit and this motion should be denied as well.

1. Applicable Law

"An entire U.S. Attorney's Office should only be disqualified, if ever, when special circumstances demonstrate that the interest of justice could only be advanced by this drastic remedy." United States v. Basciano, 763 F. Supp. 2d 303, 314 (E.D.N.Y. 2011) (denying motion to disqualify Office), aff'd, 634 F. App'x 832 (2d Cir. 2015). As defense counsel concedes, "The extreme remedy of disqualification of a United States Attorney's Office requires a showing of prejudice if not actual bad faith or misconduct." See United States v. Ramirez, No. 03 CR 1079, 2004 WL203034, at *3 (S.D.N.Y. Feb. 2, 2004).

.

9

2. <u>Discussion</u>

As discussed in detail above, the government at all times acted in good faith and did not breach any plea agreement. Accordingly, there is absolutely no basis for disqualification of the Office from prosecuting the remainder of this case. Defense counsel's inflammatory rhetoric does not suffice to meet the extremely high standard for prosecutorial disqualification. Moreover, the fact that the undersigned Assistant U.S. Attorney holds a supervisory position in the Office can have no bearing on the analysis, and defense counsel's implication that the mere involvement of a supervisor in prosecuting a case should more easily trigger the Office's disqualification is baseless. In addition, defense counsel's claim that the minimal involvement of leadership of the Office in discussions with defense counsel in this case, in which defense counsel sought to persuade the Office to adopt his loss calculation methodology, should be a ground for disqualification of the Office is absurd. All defense counsel has alleged is that defense counsel was given the opportunity to meet with the Office's Chief of the Criminal Division, that Chief in good faith took the time to listen to defense counsel's explanation of his loss calculation methodology and agreed to share the government's loss calculation analysis. Ultimately, as happens frequently in the full gamut of the Office's cases, the Office had a good-faith disagreement with defense counsel's analysis. Defense counsel has pointed to nothing that could even approach satisfying his burden of proving bad faith or misconduct on the part of the Office sufficient to justify disqualification.

Further, as argued above, the defendants have failed to establish that they suffered any prejudice with respect to their advisory Guidelines range, and disqualification therefore cannot be predicated on prejudice.

III.    Conclusion

      For the reasons set forth herein, the government respectfully submits that the defendants' motions should be denied.

                                            Respectfully submitted,

                                            RICHARD P. DONOGHUE
                                            United States Attorney

                          By:      /s/
                                             Christopher Caffarone
                                             Alicyn L. Cooley
                                             Assistant U.S. Attorneys

Cc:    Clerk of the Court (ADS) (by ECF)
        Defense Counsel (by ECF)