UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

UNITED STATES OF AMERICA,

              -against-

ADAM MANSON,

                      Defendant.

------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**

13-CR-453 (GRB)

FILED
CLERK

1:29 pm, Dec 16, 2022

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**Appearances:**

Christopher Charles Caffarone, AUSA
United States Attorney's Office
Eastern District of New York
610 Federal Plaza
Central Islip, NY 11722
Counsel for the Government

Andrew James Frisch, Esq.
40 Fulton St., 17th Floor
New York, NY 10038
Attorney for Defendant

**GARY R. BROWN, United States District Judge:**

On October 7, 2022, this Court sentenced defendant Adam Manson principally to 24 months'

incarceration, based upon his plea to a securities fraud conspiracy, involving lying to auditors and a financial

institution to help conceal the misappropriation of more than ten million dollars.  His surrender date is

presently set for January 16, 2023.  By application dated November 28, 2022, Manson's counsel seeks bail

pending appeal.  DE 277.  Manson argues that the sentencing was both procedurally and substantively

unreasonable, claiming that this Court (1) upwardly departed from the applicable United States Sentencing

Guidelines (USSG) range without providing advance notice; (2) "misapplied" the sentencing disparities

provision of 18 U.S.C. § 3553(a)(6) and (3) relied on matters outside the record in connection with the

sentencing.  Because these arguments are factually and legally spurious, the application is DENIED.

**BACKGROUND**

In an opinion, Judge Spatt summarized the background of this case as relevant herein:

Between 2005 and 2012, [Manson's codefendant] Callahan operated a large-scale Ponzi scheme. He took money from investors purportedly to invest in hedge funds, stocks, bonds and other investment vehicles. However, unknown to investors, Callahan used those funds to pay redemptions to prior investors; to pay himself $6 million; and to purchase and renovate the Panoramic View, a cooperative development in Montauk, New York, for the sum of $38 million, in which he, personally, had a 50% ownership interest.

Manson, Callahan's brother-in-law, assisted Callahan in carrying out the scheme by, among other things, handling the purchase of the Panoramic View with investor money; lying to banks in connection with that transaction; and lying to auditors in order to enable Callahan to continue defrauding investors.

For their conduct, a grand jury sitting in the Eastern District of New York on July 31, 2013 returned a 19-count indictment charging Callahan and Manson variously with securities fraud, wire fraud, conspiracy to commit securities fraud, conspiracy to commit wire fraud and aggravated identity theft.

\*         \*         \*         \*

On May 12, 2014, Manson pleaded guilty, pursuant to a plea agreement, to one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Similar to Callahan, Manson's plea agreement included, as part of its Guidelines estimate, a loss enhancement of more than $50,000,000 but less than $100,000,000, resulting in an estimated Guidelines range of imprisonment of 121 to 151 months imprisonment. However, because the statutory maximum for the offense of conviction was five years imprisonment, the advisory Guidelines range became 60 months.

\*         \*         \*         \*

On September 15, 2017, Callahan appeared for sentencing. After hearing extensive arguments from defense counsel and the Government regarding the appropriate loss calculation, the Court rejected Callahan's argument and agreed with the Government and Probation that Callahan caused $19.7 million in loss. [ ] The Court examined each of the factors set forth in 18 U.S.C. § 3553(a), and sentenced Callahan to 144 months incarceration—a variance below the applicable advisory Guidelines range of 151 to 188 months.

*United States v. Callahan*, 2020 WL 108452, at \*1-2 (E.D.N.Y. Jan. 9, 2020); DE 226 at 2-4.

Manson's plea agreement contains an appellate waiver in the event the Court imposed a sentence of 60 months or less.  DE 219 at 3.  At his plea hearing, Manson testified that "I knowingly agreed with Brian Callahan, my brother-in law, to make an untrue statement of material fact to the auditors who were conducting audits of the investment funds controlled by Brian Callahan, audits that I understood were to be

provided to the investors." DE 68 at 18.  In a Presentence Memorandum, the Government further articulated Manson's conduct:

> Prior to the acquisition of the Panoramic, Manson and Callahan formed a joint venture whereby each man would own a 50% interest in the Panoramic. (PSR 15-16; GX1).  [ ] While Manson did not solicit investments or communicate with Callahan's investors about the nature of their investments, he did assist Callahan in carrying out the charged investment scheme by lying to the auditors. Specifically, acting at Callahan's direction, Manson falsely told the auditors that: (1) there were no other debts associated with the Panoramic; and (2) when Panoramic units were sold, any profits would first be used to pay off Callahan's investors. In order to effectuate this fraud, Callahan directed Manson to remove any references to Barclays, who was the bank that provided the acquisition and constructions loans, or those loans on Distinctive's balance sheet and closing statements. Manson complied. Manson also concealed his familial relationship with Callahan.

DE 270 at 2. In that document, the Government recounts in painstaking detail Manson's extensive involvement in the fraud, helping to conceal the massive misappropriation of funds by falsifying records, creating fictious sales through straw buyers, hiding the source of multi-million dollar transfers and making affirmative misrepresentations to the auditors and a financial institution.  *Id.* at 1-6; *cf.* DE 279 at 2-6.

On April 26, 2016, the Probation Department submitted a Presentence Investigation Report (PSR) regarding Manson, calculating a total offense level of 33, with a range of imprisonment of 135 to 168 months, but noting that his plea to a 60-month statute capped his exposure.  PSR at 13, 20.  In ensuing motion practice, Judge Spatt rejected an argument by both Manson and Callahan concerning whether the Government had breached its obligations under the plea agreements, holding:

> In the Defendants' view, if the Government based its calculations on the previously articulated $96 million fraud value, then, after applying credits for the value of the redemptions returned to the defrauded, the loss enhancement for their conduct would be $0. Thus, Callahan would not have been sentenced to a term of imprisonment and Manson would similarly escape imprisonment at his upcoming sentencing.

> The Court finds that the Defendants' argument is confused, at best, and misleading, at worst.

*Callahan*, 2020 WL 108452, at *4.

Sentencing for Manson was scheduled before the undersigned for May 31, 2022.  One week earlier, the Government indicated – with little explanation – that it agreed with Manson's position that the enhancements calculated by the Probation Department were inappropriate because the losses resulting from

the scheme "were not reasonably foreseeable to him." DE 264 at 1. This represented a significant change in the Government's position. *See* 2020 WL 108452 at *3 ("Given the Government's representation that it advocates using the same estimate of loss at Manson's sentencing, the Court will conclusively resolve each challenge to the Government's stance as if it applies to both defendants."). On the initial sentencing date, two problems emerged: one was the recognition that a *Curcio* waiver was required in connection with the representation of both defendants by Mr. Frisch. The second were factual and legal concerns raised by the Court about the parties' newly-stipulated position concerning the proper loss calculation under the Guidelines. *See generall*y Transcript of Proceedings dated May 31, 2022, DE 282.[1]

During that proceeding, defense counsel raised the argument that "according to the application notes of 2B1.1, his Guidelines become zero to six months because the collateral was liquidated for the benefit of victims." Tr. 18. The Court expressed significant skepticism on this point. *See, e.g.*, Tr. 21 ("Isn't there case law  [ ]  that suggests that a post-indictment or post-plea sale or recovering assets is not credited under the Guidelines?"). As a result, the Court adjourned the sentencing, directing the parties to file papers explaining the justification for the change in position regarding loss amount, whether post-indictment recoupment are credited for Guidelines purposes and whether gain should be used as an alternative measure in this case. Tr. 42-43. Counsel for the Government filed a supplemental sentencing memorandum. DE 270. Counsel for Manson filed nothing.

---

[1] Judge Spatt had previously rejected a similar argument in connection with a previous set of defendants' motions:

> the Defendants argue that the Government's position rests on the erroneous belief that they were not entitled to credits for the net proceeds for the sale of the Panoramic View. The Defendants are incorrect in characterizing the receipt of credits as an entitlement. That would only have been true if the redemptions occurred before the fraud was detected. *See* U.S.S.G. § 2B1.1 cmt. n. 3(E)(i) (stating that loss should be offset by "money returned, and the fair market value of the property returned and the services rendered, by the defendant ... to the victim before the offense was detected"). Here, the redemptions occurred due to the efforts of the Government after forfeiture of the property. Therefore, whether to credit such redemptions against the actual loss was subject to the discretion of the Court. *See Stitsky*, 536 F. App'x at 111 ("[E]ven if some of Cobalt's properties retained value at the time the fraud was uncovered, as defendants contend, the district court reasonably concluded that the Cobalt securities had no value because there was no realistic possibility that Cobalt would be able to generate a positive return for investors.").

*Callahan*, 2020 WL 108452, at *10. At oral argument, the parties attempted to distinguish this determination by focusing on note 3(E)(ii), rather than note 3(E)(i).

At the sentencing proceeding on October 7, 2022, discussion and argument were held, several victims testified, and the Court engaged the parties in a discussion about alternative measures of loss, including the possible use of gain. Following argument, the Court reluctantly agreed to adopt the recommended 0-6 month advisory Guidelines range as a starting point, expressly cautioning the parties that this range failed to adequately capture the nature of the conduct at issue. *See, e.g.*, Sentencing Tr. at 38. ("That guideline level makes no sense to me. [ ] If the parties wish to agree [to] them, I will consider them. I will give you th[is] warning ahead of time: I do think it understates the conduct."). Defense counsel characterized the Guidelines calculation proffered by the parties as "artificial." Sentencing Tr. at 23, 39. The Court sentenced defendant to 24 months imprisonment, one year of supervised release and a $100 special assessment. *Id.* at 53-54.

**Standard of Review**

As Judge Amon recently observed:

Under 18 U.S.C. § 3143(b)(1), a court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained," unless the court finds:

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released ... and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

*See also United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985) (summarizing the analysis under § 3143(b)(1) as involving four elements: (a) flight risk or danger, (b) not for the purpose of delay, (c) substantial question of law or fact, and (d) likely to result in reversal or new trial), *cert. denied*, 474 U.S. 1008 (1985). For a defendant who has already been found guilty, there is "a presumption in favor of detention," with the defendant "bear[ing] the [plainly substantial] burden of rebutting that presumption by clear and convincing evidence." *United States v. Razzouk*, 11-cr-430 (ARR), 2018 WL 3062585, at *1 (E.D.N.Y. June 21, 2018) (*quoting United States v. Abuhamra*, 389 F.3d 309, 319 (2d Cir. 2004)).

*United States v. Singh*, 2022 WL 16855789, at *1 (E.D.N.Y. 2022). In this case, flight and danger are not at issue; indeed, the Court permitted the defendant to remain at liberty pending his surrender date. Rather,

as defendant acknowledges, his application rests upon the test articulated in *Randell*, DE 277 at 2, such that this Court must "determine first whether any question raised on appeal is a 'substantial' one" and, if so, "then consider whether that question is 'so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial.'" 761 F.2d at 125. *Randell* noted that a "substantial question" is something non-frivolous "that very well could be decided the other way." *Id.* More recently, as part of a determination concerning Manson's codefendant, the Circuit observed that "18 U.S.C. § 3143(b), which governs bail pending appeal [ ] requires detention absent a finding, among other things, that the appeal is 'likely to result in' reversal, an order for a new trial, or a new sentence that is less than the time already served." *United States v. Manson*, 788 F. App'x 30, 32 (2d Cir. 2019).

**DISCUSSION**

**a. Notice of Purported Upward Departure**

Manson's primary argument that his appeal raises a substantial question rests on the contention that the "Court *sua sponte* upwardly departed from the Guideline range without providing advance notice as required." DE 277 at 2 (citing *United States v. Anati*, 457 F.3d 233, 236-37 (2d Cir. 2006)). But the Court did not impose an upward departure here; rather, as it announced it would do when reluctantly accepting the parties' agreed-upon Guideline range (and after exploring other Guidelines options with the parties), the Court varied from this Guidelines range based on factors set forth in 18 U.S.C. § 3553. *See, e.g.*, Sentencing Tr. at 52 ("I've accepted that range as a starting point. I do believe it woefully understates the gravity of the offense here"); *cf. id*. at 48-49, 51-54 (reviewing § 3553 factors); DE 274 (Statement of Reasons noting bases for variance). *Anati* has been overruled in the context of variances. *United States v. Sandoval*, 293 F. App'x 809, 812 (2d Cir. 2008) ("Sandoval argues that the sentence should be vacated because Judge Chin sentenced him above the advisory Guidelines range without providing notice, in violation of Fed. R. Crim P. 32(h). [T]he Supreme Court, however, recently foreclosed this argument in *Irizarry v. United States*, [553] U.S. [708], 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008), explicitly overruling our contrary holding in [*Anati*].").

6

Counsel's reliance upon *United States v. Bronson*, 2008 WL 2224945, at *1 (E.D.N.Y. 2008) is similarly misplaced: in *Bronson*, which predates *Irizarry*, the Court was "considering an upward departure from the 18 to 24 month Guideline imprisonment range recommended in the Pre-Sentence Investigation Report."  In this case, the Court sentenced the defendant far below the range contained in the PSR.

Moreover, the specific harm articulated by Manson was that "[a]bsent notice, Mr. Manson had no reason to request an evidentiary hearing, nor did Mr. Manson appear for sentencing prepared to address the Court's consideration of an upward departure."  DE 277 at 3.  This is simply untrue.  At the May 31, 2022 hearing – months in advance of the sentencing – the Court articulated its concerns with the proposed Guidelines range and permitted counsel to make additional filings and prepare for sentencing.  In his reply, counsel argues:

> Whatever the nominal label to the Court's process - - departure, variance, or *de facto* recalculation of the Guidelines - - the absence of advance notice disabled Mr. Manson from making arguments on the evidence or demanding a *Fatico* hearing about, among other things, whether he caused any loss or realized any gain, and whether the evidence showed that any part of Mr. Callahan's larger fraud was reasonably foreseeable to him.

DE 281 at 3; *cf. id*. at 3-4 (arguing that sentence was imposed "absent advance notice of intent to impose a greater sentence" and "the Court sentenced Mr. Manson on an erroneous and unprovable view of the evidence without providing him a fair opportunity to be heard").  Yet, at the initial sentencing hearing more than four months before sentence was imposed, the inquiries and directives by the Court included the following:

> THE COURT:  So if we look at the Pre-sentence Investigation Report at paragraph 29, for example [ ] -- we have this defendant – not Mr. Callahan -- contacting Barclays and advising that all but one of his 32 investors in the nonexistent investment fund were willing to contribute additional funds to the Panoramic View project. In actuality, Manson did not have either an investment fund or 32 investors. And it goes on like that.
>
> And there are other lies to other [auditors]. He, at one point, disclaims the knowledge of either his mother or his father or his wife, that they have the same last name.
>
> So from that, doesn't one infer that he knew that the money was not coming from a legitimate source?

*          *          *          *

THE COURT: So you're saying the fact that he might have gained substantially doesn't matter? That doesn't seem to make sense to me.

*          *          *          *

THE COURT: Isn't the actual gain from the conduct one of the measures that's recommended by the Guidelines to be considered?

*          *          *          *

MR. FRISCH: And I want to make sure, you know, I think that Mr. Caffarone has reached the right result, and we stand ready to do whatever it takes.

THE COURT: I understand, and I understand why you believe that was a right result and maybe it is, but from what I have in front of me, it doesn't seem like the right result. I don't know why it's the right result. So I want to give everyone --

MR. FRISCH: We're here to help the Court.

*          *          *          *

THE COURT:  I would like a brief from the attorneys, obviously, supporting your position on the zero to six months because I do not understand it as it currently exists. And what I'd like you to address in that will also be the question of gain from the activities, [ ] as well as whether or not the case law supports the notion that one gets credit from the [ ] post-criminal proceeding recovery.

Again, I have some recollection that there is some at least Guidelines case, and I recognize the Guidelines are advisory but we have to have a starting point, that suggests that that doesn't get credited.

So I would like you to address that as well, as well as explain to me how you came up with this position because I just don't understand it, and I'm happy to consider anything you want to tell me in that regard.

Tr. at 9, 27-28, 30, 42-43.  In light of this record, Manson's claim that the Court denied him an opportunity to be heard regarding a potential variance from the stipulated Guidelines range proves meritless.

**b.  Consideration of Callahan's Sentence**

Next, Manson argues that, by noting Callahan's sentence during Manson's proceeding, the Court misapplied Section 3553(a)(6), which provides that courts have a duty to avoid "unwarranted sentence disparities" among similarly situated defendants.  DE 277 at 4-5.  As the Second Circuit has observed:

Among the factors a sentencing court must consider in imposing a sentence is "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Because § 3553(a)(6) is only one of the several factors that a district court must balance, "a district court's

> identification of disparity does not necessarily require it to adjust a sentence downward from the advisory guidelines range in order for that sentence to be reasonable ... much less compel any particular reduction." *United States v. Florez,* 447 F.3d 145, 157–58 (2d Cir.2006) (internal quotation marks and citations omitted). Rather, "the weight to be given such disparities, like the weight to be given any § 3553(a) factor, 'is a matter firmly committed to the discretion of the sentencing judge and is beyond our [appellate] review, so long as the sentence ultimately imposed is reasonable in light of all the circumstances presented.'" *Id.* at 158 (quoting *Fernandez,* 443 F.3d at 32).

*United States v. Goberdhan,* 499 F. App'x 63, 66–67 (2d Cir. 2012). In fact, the Second Circuit has adopted an approach which "does not require district courts to consider sentencing disparity among co-defendants, [but] it also does not prohibit them from doing so." *United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (*abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007)). *Wills* went on to note:

> Under the advisory Guidelines scheme explicated in *Booker*, it is appropriate for a district court, relying on its unique knowledge of the totality of circumstances of a crime and its participants, to impose a sentence that would better reflect the extent to which the participants in a crime are similarly (or dissimilarly) situated and tailor the sentences accordingly. It would be anomalous to grant a district court "broad discretion in imposing a sentence within a statutory range," *Booker,* 543 U.S. at 233, 125 S.Ct. 738, but deny the court the ability to consider the sentence in its complete relevant context.

476 F.3d at 110.

Counsel argues that Callahan was far more culpable than Manson, to whom, it is contended, certain aspects of the losses were not reasonably foreseeable. The Court expressly recognized the vast differences in culpability between these two defendants. *See, e.g.*, Sentencing Tr. at 51 ("when I'm comparing sort of disparate treatment factor, I do want to note this defendant played a much lesser role than Mr. Callahan."). The comparative culpability of the defendants is reflected, in part, in Manson's sentence, consisting of one sixth the amount of time to which his more culpable coconspirator was sentenced.

### c. Findings from the Parallel SEC Enforcement Action

Counsel also argues that the Court erred in mentioning "an allegation" contained in a parallel SEC enforcement action. In fact, the Court referenced a judicial finding in that action – in which Manson was represented by Mr. Frisch – noting that Manson "was aware of and participated in the schemes to defraud investors of the Callahan Funds and creditors of the Distinctive Entities." Sentencing Tr. 50.

Manson offers no law in support of the contention that the consideration of judicial findings during sentencing is inappropriate, perhaps because there is none.  As the Supreme Court has held:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). Underlying this tradition is the principle that "the punishment should fit the offender and not merely the crime." *Williams*, 337 U.S., at 247, 69 S.Ct. 1079; *see also Pennsylvania ex rel. Sullivan v. Ashe,* 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender").

Consistent with this principle, we have observed that "both before and since the American colonies became a nation, courts in this country and in England practiced a policy under which a sentencing judge could exercise a wide discretion in the sources and types of evidence used to assist him in determining the kind and extent of punishment to be imposed within limits fixed by law." *Williams,* 337 U.S., at 246, 69 S.Ct. 1079. In particular, we have emphasized that "[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.*, at 247, 69 S.Ct. 1079. Permitting sentencing courts to consider the widest possible breadth of information about a defendant "ensures that the punishment will suit not merely the offense but the individual defendant." *Wasman v. United States*, 468 U.S. 559, 564, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984).

In 1970, Congress codified the "longstanding principle that sentencing courts have broad discretion to consider various kinds of information" at 18 U.S.C. § 3577 (1970 ed.). *United States v. Watts*, 519 U.S. 148, 151, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (*per curiam*). Section 3577 provided:

> "*No limitation* shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." (Emphasis added.)

In the Sentencing Reform Act of 1984 (SRA), 18 U.S.C. § 3551 *et seq.*, Congress effected fundamental changes to federal sentencing by creating the Federal Sentencing Commission and introducing the Guidelines scheme. In doing so, however, Congress recodified § 3577 without change at § 3661. The Sentencing Commission, moreover, expressly incorporated § 3661 in the Guidelines:

> "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, *without limitation,* any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661." USSG § 1B1.4 (Nov. 2010) (emphasis added).

> Both Congress and the Sentencing Commission thus expressly preserved the traditional discretion of sentencing courts to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

*Pepper v. United States*, 562 U.S. 476, 487-89 (2011). Indeed, a district court may consider acquitted conduct or even illegally seized evidence in sentencing. *See United States v. Martinez*, 769 F. App'x 12, 17 (2d Cir. 2019) (acquitted conduct) (citing *United States v. Vaughn*, 430 F.3d 518, 526-27 (2d Cir. 2005)); *United States v. Mathison*, 731 F. App'x 41, 45 (2d Cir. 2018) (illegally seized evidence) (citing *United States v. Tejada*, 956 F.2d 1256, 1263 (2d Cir. 1992)). Given the broad lens afforded to sentencing judges, the consideration of findings by a district judge in a proceeding in which defendant participated through the same counsel now representing him cannot reasonably be construed as being outside the scope of permissible consideration.

Even assuming the reference was somehow impermissible, any such error would be harmless. The Court expressly referred to the finding as "an interesting background [ ] fact" for the sentencing. Sentencing Tr. 50 (citing *S.E.C. v. Callahan*, 103 F. Supp. 3d 296, 303 (E.D.N.Y. 2015)) (finding that "Manson and his companies, the Distinctive Entities, played a central role in defrauding the investors of the Callahan Funds"). The reference to which defendant now objects proves immaterial when compared to the specific findings made at sentencing:

> We should be clear on what happened. The defendant lied to the auditors and made massive [mis]representations involving tens of millions of dollars. I recognize again that Mr. Callahan was formally culpable, but this defendant was not ignorant of the scope of his own criminal conduct, which was extreme in its impact. He lied to the auditors again [and again]. The investors paid for those audits and got false information in return. And had Mr. Manson done what he was supposed to have done, which is to tell the truth under the law, that the audit would have read differently. The scheme may well have unraveled sooner, certainly would not have continued for as long as it did, and the investors would not have been led to rely on false information in determining whether or not to continue their investment or make their investments and so forth.
>
> In his letter to the Court, the defendant has written that real estate management was his "whole life", and cites his caretaker activities, waters the flowers. As I point[ed] out, this is a mischaracterization. He held various positions with [investment] banks, positions which belie the notion that the defendant was passive. [He could not have been unaware of] the consequences of his actions. He knew, even if unaware of the entire scheme, of the implications, the serious implications, and the serious consequences of his own fraudulent actions. So, at the end of the day, this is a serious crime that requires a significant sentence.

11

Sentencing Tr. at 52-53.

> **d.   Enforceability of the Appellate Waiver**

As noted, the defendant's plea agreement contains an appellate waiver in the event of sentence of incarceration of less than 60 months, a waiver that was "binding without regard to the sentencing analysis used by the Court." DE 279 at 7.  At his plea hearing, Manson acknowledged that he understood and agreed to waive any appeal if sentenced to less than 60 months.  DE 68 at 9-10.  On this application, Manson argues that the waiver is unenforceable, a notion predicated upon the assertion that "[a] proper waiver would have been based on the truly applicable Guideline range, which the government ultimately determined was zero to six months." DE 277 at 6.  While this issue is before the undersigned solely for the limited purpose of determining release pending appeal, for the many reasons set forth above, there remains significant doubt that the stipulated range represented the "truly applicable" range.  And while not fully dispositive of the question, it is noteworthy that the Second Circuit upheld the appellate waiver in the plea agreement relating to Manson's codefendant.  *United States v. Manson*, 788 F. App'x 30, 32 (2d Cir. 2019).

> **CONCLUSION**

For these reasons, the issues raised by Manson are neither substantial nor likely to result in a reversal or reduced sentence, and therefore fail to satisfy the requisites of *Randell*.  Thus, defendant's application for bail pending appeal is denied.

> SO ORDERED.

> Dated:  Central Islip, NY
>              December 16, 2022

                                        /s/ Gary R. Brown
                                        Hon. Gary R. Brown
                                        United States District Judge